## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

| | | |
|---|---|---|
| JOHN B. ADAMS, | : | |
| Plaintiff, | : | |
| | | Case No. 3:13cv00255 |
| vs. | : | |
| | | District Judge Thomas M. Rose |
| CAROLYN W. COLVIN, | : | Chief Magistrate Judge Sharon L. Ovington |
| Acting Commissioner of the Social | | |
| Security Administration, | : | |
| Defendant. | : | |

## REPORT AND RECOMMENDATIONS[1]

### I.    Introduction

Plaintiff John B. Adams sought financial assistance from the Social Security

Administration by applying for Disability Insurance Benefits ("DIB") in September 2009,

alleging disability since February 15, 2009.  (*PageID##* 283-84).  He claims disability

due to Rhabdomyolysis.[2]  (*PageID##* 298, 710-13).

---

[1]Attached hereto is NOTICE to the parties regarding objections to this Report and Recommendations.

[2]Rhabdomyolysis is the breakdown of muscle fibers, leading to the release of a protein called myoglobin into the bloodstream, where it is filtered out by the kidneys. This can cause damage to kidney cells. Risk factors include vigorous exercise, trauma or crush injuries, and genetic muscle diseases. *See* A.D.A.M. Medical Encyclopedia, www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001505, last accessed October 29, 2014.

After various administrative proceedings, Administrative Law Judge ("ALJ") John J. Barry denied Plaintiff's DIB application based on his conclusion that Plaintiff's impairments did not constitute a "disability" within the meaning of the Social Security Act.  (*PageID##* 93-109).  The ALJ's nondisability determination and the resulting denial of benefits later became the final decision of the Social Security Administration.  Such final decisions are subject to judicial review, *see* 42 U.S.C. § 405(g), which Plaintiff is now due.

This case is before the Court upon Plaintiff's Statement of Errors (Doc. #10), the Commissioner's Response in Opposition (Doc. #13), Plaintiff's Reply (Doc. #15), the administrative record (Doc. #8), and the record as a whole.

## II.  <u>Background</u>

### A.  <u>Plaintiff's Vocational Profile and Testimony</u>

Plaintiff was 44 years old on his date last insured and is thus considered to be a "younger individual" for purposes of resolving his DIB claim.  *See* 20 C.F.R. § 404.1563(c); *see also PageID##* 107, 294.  Plaintiff completed 9th grade and has a "limited" education.  (*PageID##* 149, 303).  Plaintiff has past relevant work experience as a carpet installer and floor installer  (*PageID##* 107, 173-74, 299).

Plaintiff testified that he is 6' tall, weighs 180 pounds, and lives with his wife and child.  (*PageID#* 148).  His wife works full time.  (*Id.*).  Plaintiff does not have a driver's license and his wife brought him to the hearing.  (*PageID##* 148-49).  Plaintiff testified that he last worked in 2008 installing carpets and flooring (which he did for 18 years).

(*PageID#* 167).  He stopped working due to knee pain.  (*PageID##* 150-51).  He noted also that he was doing side jobs for a short period of time, but stopped working completely in February 2009.  (*PageID##* 152-53).  Plaintiff testified that on the morning of February 14, 2009, he woke up but could not hear anything and could not move either of his legs.  (Doc. #153-54).  He testified he could not use the bathroom because his kidneys had shut down.  (*Id.*).  His wife took him to the hospital, where he was diagnosed with Rhabdomyolysis.  (*Id.*).  He spent 26 days in intensive care in 2009.  (PageID# 155).  He underwent dialysis 3 times per week.  (*Id.*).

Plaintiff presently takes methadone and Neurontin for pain resulting from his Rhabdomyolysis.  (*PageID#* 155).  He described his left leg as feeling "dead" from the knee down, and stated that his back is constantly in pain and he has difficulty keeping his balance.  Plaintiff described the feeling as, "feel[ing] like when you are standing on a sleepy foot, you know, when it - but it stays that way.  It never comes-I mean I get dizzy, blurred vision. I don't think clearly you know?"  (*PageID##* 156-57).  Plaintiff reported that he goes to the pain doctor every month, and side effects from medication include dizziness and blurred vision.  He also noted that changes in the weather increase pain.  (*PageID#* 158).

Plaintiff estimated that he could "probably" walk about 100 feet and stand for about 5 to 10 minutes before he would need to sit down.  He testified he would then need to rest for 10 to 15 minutes before he would be able to stand or walk again.  (*PageID##*

3

158-59).  Plaintiff testified the heaviest thing he could lift in his home was a coffee pot.
(*PageID#* 166).

Plaintiff stated that being in the reclined position is the most comfortable position
for him and that he sleeps in a recliner.  (*PageID#* 160).  During a typical day, Plaintiff
usually rests because he does not sleep well at night.  (*PageID##* 169-70).

A few months prior to the hearing, Plaintiff reported that he tried to go upstairs in
his house but fell down and broke his arm.  (*PageID#* 161).  Plaintiff also reported
problems with his left hand and palm because of blood clots.  He stated that he can't
straighten his elbows.  (*PageID#* 162).  Plaintiff testified that he does not do any
household activities, such as cooking, washing dishes, or doing laundry.  (*PageID##*
162-63).  Plaintiff testified he had a history of alcohol consumption but he quit drinking,
with a few exceptions, when his daughter was born in 2001.  (*PageID##* 163-64).

When cross examined by his counsel, Plaintiff testified that he needed help from
his wife in order to get dressed and take a shower.  (*PageID##* 165-66).  Plaintiff felt he
would not be able to perform a sedentary type job because of pain he experiences in his
back.  (*PageID##* 168-69).

### B.  <u>Vocational Expert Testimony</u>

A Vocational Expert ("VE") also testified at the hearing.  She classified Plaintiff's
past employment as a carpet installer as heavy, skilled work, and as a floor installer as
medium, semi-skilled work.  (*PageID##* 173-74).

The ALJ presented a hypothetical question to the VE based on Plaintiff's age, education, work experience, and residual functional capacity ("RFC"). He asked the VE to assume such a hypothetical individual had the following restrictions: could only lift and carry less than 10 pounds frequently and 10 pounds occasionally; could only sit for 7 hours; could only stand or walk for 1 hour with alternating between sitting and standing every 15 minutes; would never be able to climb stairs, ramps, ladders, and scaffolds; would be limited to simple, routine, repetitive tasks with only superficial contact with the public, co-workers, and supervisors with no fast-paced production quotas in a static work environment; and could be off-task for 10 percent of the workday. (*PageID#* 175).

The VE testified that being off-task 10 percent of the workday was over and above the typical breaks that would be given and there would be no competitive work. (*PageID##* 175-76).

On March 5, 2010, the VE completed interrogatories in response to an amended hypothetical question from the ALJ wherein the VE opined that the hypothetical individual would be able to perform unskilled, sedentary occupations such as an auditing clerk/pari-mutuel ticker checker (630 jobs in southwest Ohio); a general office clerk/ microfilm document preparer (800 jobs in southwest Ohio); and a receptionist/ information clerk/telephone quotation clerk (795 jobs in southwest Ohio). (*PageID##* 346-47). The VE further noted that her response is consistent with the Dictionary of Occupational Titles ("DOT"), however, she noted the DOT does not specifically address

the alternate sit/stand option, but the VE responded that it is her vocational opinion that such jobs exist.  (*PageID#* 348).

At a second administrative hearing held on April 23, 2012, the VE affirmed her responses to the above interrogatories.  (*PageID##* 127-28).

When cross examined by Plaintiff's counsel, the VE testified she could not identify full time race tracks that would support the pari-mutuel ticket taker jobs she reported to the ALJ.  (*PageID#* 133).  Plaintiff's counsel further questioned the VE as to the effect of only being able to sit a maximum of 4 hours in an 8-hour workday.  The VE responded that it would be less than full time work.  (*PageID#* 135).  If sitting were increased to 6 hours per day – with the individual needing to stand for 10 minutes per hour because of pain and was unproductive during this time – the VE responded that competitive full time employment would not be possible.  (*PageID#*136).

The VE acknowledged that if a hypothetical individual needed to lay down 10-15 minutes in an 8-hour workday, above and beyond normal breaks, the hypothetical worker would be unable to maintain employment.  (*PageID##* 136-37).

### C.     Relevant Medical Opinions[3]

#### Jacob Kitchener, M.D.

---

[3]In addition to his physical impairments, the undersigned recognizes that Plaintiff alleges disability in part because of his mental impairments.  Plaintiff's Statement of Errors, however, focuses primarily on Plaintiff's physical impairments and limitations.  Accordingly, the Court will focus its review of the medical evidence on Plaintiff's physical impairments and limitations.

6

Dr. Kitchener, a specialist in electrodiagnostic medicine performed an EMG on Plaintiff on March 25, 2009, which he assessed as "a severely abnormal study."  He found electrodiagnostic evidence for a severe left sciatic nerve injury, with what appears to be axonotmesis.  Dr. Kitchener concluded that "there were several muscles in the left leg distal to the knee that showed marked amounts of abnormal spontaneous activity (fibrillations, positive sharp waves) and no recruitable motor unit action potentials." (*PageID##* 471-73).

### Amita Oza, M.D.

On December 7, 2009, Dr. Oza consultatively examined Plaintiff at the request of the Ohio Bureau of Disability Determination (BDD).  (*PageID##* 501-07).  Upon examination, Dr. Oza found significant tenderness on palpation of the lower lumbar spine.  On straight leg raising, Plaintiff could elevate his left lower extremity up to 30 degrees, and his right lower extremity up to 45 degrees.  Range of motion at Plaintiff's knees was full and normal on right side, but slightly decreased on left side.  He had no movement at left ankle but full range of motion at the right ankle.  He could not feel sensations in the L5-S1 dermatome distribution as well as below his knee.  Dr. Oza could not obtain reflexes on the left side at all, and on the right side it was 1 plus.  He had some foot drop and walked with orthonics, limping on his left side and using a cane on the right.  Range of motion at lumbar LS spine was also restricted.  (*PageID#* 502).  Dr. Oza assessed that Plaintiff has left foot drop due to peroneal nerve injury, chronic back pain, and left sided L5-Sl radiculopathy.  Dr. Oza also noted that Plaintiff has a previous

history of Rhabdomyolysis and history of acute renal failure; he needs help to get dressed; and has a past history of alcohol abuse.  Dr. Oza opined that "[w]ork related activities even at sedentary level would be affected at this time."  (*PageID#* 503).

### W. Jerry McCloud, M.D./William Bolz, M.D.

State agency physician, Dr. McCloud, reviewed the file in January 2010 on behalf of the Ohio BDD.  (*PageID##* 535-42).  Dr. McCloud determined that Plaintiff could lift, carry, push and pull 20 pounds occasionally and 10 pounds frequently; stand and/or walk for 4 hours in an 8-hour workday; and sit for about 6 hours in an 8-hour workday with the option to alternate between sitting and standing every 1 hour in order to relieve pain or discomfort.  (*PageID##* 536-37).  Plaintiff could never climb ladders, ropes, or scaffolds; could never crawl; and could only occasionally balance, stoop, kneel, and crouch. (*PageID#* 537).  Plaintiff also must avoid all exposure to hazards, such as machinery, heights, etc.  (*PageID#* 529).  Dr. McCloud concluded that "[Plaintiff] has a serious [medically determinable impairment] and the severity of the symptoms are not disproportionate to the clinical findings.  The severity of the symptoms and its alleged effect on functioning is consistent with the [medical evidence of record].  [Plaintiff]'s statements are credible." (*PageID#* 540).  In May 2010, state agency physician, Dr. Bolz affirmed Dr. McCloud's assessment.  (*PageID#* 606).

### Barbara Coffey, Certified Nurse Practitioner

Plaintiff began treating with Ms. Coffey at After Hours Internal Medicine LLC in March 2011.  (*PageID#* 714).  On November 28, 2011, Ms. Coffey reported that Plaintiff

suffers from chronic severe muscle and multiple joint pain. (*PageID#* 715). Objective findings include sensory loss, impaired sleep, muscle spasm, muscle weakness, and impaired gait and balance. (*Id.*). Ms. Coffey also found that Plaintiff's pain interferes with his attention and concentration "constantly." (*PageID#* 716). Ms. Coffey opined that Plaintiff could only sit, stand and walk for less than 2 hours in a normal workday with normal breaks. (*PageID#* 718). In addition, Ms. Coffey determined that Plaintiff would not be able to make it through an 8-hour workday without lying down. (*PageID#* 719). She concluded that Plaintiff would be absent 3 or more times a month due to treatment. (*PageID#* 720).

<u>Miami Valley Hospital</u>

A MRI was taken of Plaintiff's lumbar spine on February 3, 2011. It showed facet hypertrophic disease at all levels; at the L3-L4 level there was mild central canal stenosis and bilateral lateral recess stenosis with mild-to-moderate right and moderate left neural foraminal narrowing; at the L4-L5 level there was a diffuse disk bulge with disc material eccentric in a bilobed fashion with neural foramina; and at the L5-SI level there was a disc bulge/protrusion. (PageID # 681-82).

A cervical spine MRI taken that same day showed disc desiccation involving the C2 through C7 levels with diminished disc space height at C5-C6 level. There was new signal abnormality involving the multifidus muscle at C5-6 through C6-7. At the C2-C3 level, there were posterior element hypertrophic changes partially efface the dorsal epidural space. At the C3-4 level, there was mild diffuse bulge with bilateral

9

uncovertebral hypertrophy with partial effacement of the ventral epidural space.  At the C4-5 level, there was minimal retrolisthesis of C4 on C5 with some physiologic bulging with posterior element hypertrophic changes partially effacing the dorsal epidural space. At the C5-6 level, there was a diffuse disc bulge/protrusion partially effacing the ventral epidural space. Disc material was slightly eccentric within the central and left paracentral region.  At the C6-7 level, there was a central/right paracentral protrusion partially effacing the ventral epidural space with disc material extending inferior to the disc space level.  Posterior element hypertrophic changes partially efface the dorsal epidural space. (*PageID##* 685-86).

An EMG performed on February 3, 2011, showed severe left sciatic neuropathy. The radiologist noted that "[t]oday's abnormalities are very similar to those found in his EMG of 2010."  (*PageID#* 725-26).

<u>Srinivas Errogolla, M.D.</u>

On June 14, 2011, Dr. Errogolla saw Plaintiff for a pain management consultation. (*PageID##* 707-09).  Plaintiff reported back pain and left buttock pain which he rated at a level of 7 on a 0-10 visual analog scale.  Plaintiff also reported that the pain extended into the left leg and lateral posterior aspects of the left leg with occasional tingling.  (*PageID#* 707).  On examination, Plaintiff was mildly tender in lumbar spine axially.  No tenderness in lumbar paraspinal area or SI joint area.  SLR was negative bilaterally.  Manual motor testing of bilateral lower extremities was 5/5.  Muscle stretch reflexes were 2/4 in bilateral patella aud 1/4 in bilateral Achilles.  Sensory exam to light touch was decreased

in the left leg below the knee and normal on the right side. He was walking with the help of a cane. Lumbar spine range of motion for forward flexion up to 70 degrees and painful and extension up to 15 degrees. Dr. Errogolla diagnosed Plaintiff with left sciatic neuropathy; lumbar spondylosis; lumbar disc protrusion at L5-S1, mild central stenosis at L3-L4, multilevel lumbar spondylosis from L2-L3 to L5-Sl, questionable left L5 radiculopathy. Dr. Errogolla continued Plaintiff on methadone and Neurotin. (*PageID#* 709). The record shows Plaintiff continued to treat with Dr. Errogolla until at least August 9, 2011. (*PageID##* 696-706).

## III. <u>Administrative Review</u>

### A. <u>"Disability" Defined</u>

The Social Security Administration provides DIB to individuals who are under a "disability," among other eligibility requirements. *Bowen v. City of New York*, 476 U.S. 467, 470 (1986); *see* 42 U.S.C. § 423(a)(1)(D). The term "disability" – as defined by the Social Security Act – has specialized meaning of limited scope. It encompasses only those who suffer from a medically determinable physical or mental impairment severe enough to prevent them from engaging in substantial gainful activity. *See* 42 U.S.C. § 423(d)(1)(A); *see also Bowen*, 476 U.S. at 469-70. A DIB applicant bears the ultimate burden of establishing that he or she is under a "disability." *Key v. Callahan*, 109 F.3d 270, 274 (6th Cir. 1997); *see Wyatt v. Sec'y of Health and Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992); *see also Hephner v. Mathews*, 574 F.2d 359, 361 (6th Cir. 1978).

### B. <u>Social Security Regulations</u>

Administrative regulations require ALJs to resolve a disability claim through a five-Step sequential evaluation of the evidence.  *See PageID## 97-98; see also* 20 C.F.R. § 404.1520(a)(4).  Although a dispositive finding at any Step terminates the ALJ's review, *see also Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), the complete sequential review answers five questions:

1. Has the claimant engaged in substantial gainful activity?

2. Does the claimant suffer from one or more severe impairments?

3. Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments (the Listings), 20 C.F.R. Subpart P, Appendix 1?

4. Considering the claimant's residual functional capacity, can he perform his past relevant work?

5. Considering the claimant's age, education, past work experience, and residual functional capacity, can he or she perform other work available in the national economy?

*See* 20 C.F.R. § 404.1520(a)(4); *see also Colvin*, 475 F.3d at 730; *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

**C.     ALJ Barry's Decision**

Plaintiff last met the insured status requirements of the Social Security Act on December 31, 2010.  (*PageID#* 98).

At Step 2 of the sequential evaluation, ALJ Barry concluded that through the date last insured, Plaintiff had the following severe impairments: Rhabdomyolysis and peroneal nerve injury to the left leg with foot drop, chronic back pain secondary to degenerative disc disease with radiculopathy, history of renal failure, and a

12

depressive disorder NOS.  (*Id.*).

The ALJ concluded at Step 3 that Plaintiff did not have an impairment or combination of impairments that met or equaled one of the Listings, including sections 1.00, *et seq.*, 6.00, *et seq.* and 12.04.  (*PageID##* 99-100).

At Step 4, ALJ Barry evaluated Plaintiff's RFC as follows:

> After careful consideration of the entire record, the [ALJ] finds that, through the date last insured, the claimant had the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except the individual has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except he is limited to standing/walking a combined total of two hours and sitting for a total of six hours with the opportunity to alternate position between sitting and standing at 15-minute intervals, can never crawl, kneel, or climb ladders, ropes, or scaffolds, but can occasionally bend, stoop, and crouch, and is li1nited to performing simple, routine, repetitive tasks without fast paced production quotas in a static work environment with no more than frequent contact with supervisors, co-workers, and the general public.

(*PageID#* 103).

The ALJ concluded at Step 4 that through the date last insured, Plaintiff was unable to perform any past relevant work.  (*PageID#* 107).

At Step 5, the ALJ concluded that – considering the testimony of the VE, as well as the Plaintiff's age, education, work experience, and RFC – Plaintiff is capable of performing approximately 2,225 jobs at the unskilled sedentary occupational base in the regional area, such as pari-mutuel ticket checker, microfilm document preparer, and telephone quotation clerk.  (*PageID#* 108).

The ALJ's findings throughout his sequential evaluation led him to ultimately

conclude that Plaintiff was not under a disability at any time from the alleged onset date, February 15, 2009, through the date last insured, December 31, 2010.  (*PageID#* 109).

## IV.  **Judicial Review**

Judicial review of an ALJ's decision proceeds along two lines: "whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007).

Review for substantial evidence is not driven by whether the Court agrees or disagrees with the ALJ's factual findings or by whether the administrative record contains evidence contrary to those factual findings.  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007); *see Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999).  Instead, the ALJ's factual findings are upheld if the substantial-evidence standard is met – that is, "if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Blakley*, 581 F.3d at 407 (quoting *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)).  Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance..." *Rogers*, 486 F.3d at 241.

The second line of judicial inquiry, reviewing for correctness the ALJ's legal criteria, may result in reversal even if the record contains substantial evidence supporting the ALJ's factual findings.  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d

647, 651 (6th Cir. 2009) ("[E]ven if supported by substantial evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" (quoting in part *Bowen*, 478 F.3d at 746, and citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004)).

**V.    Discussion**

Plaintiff's statement of errors lists four distinct assignments of error: (1) the ALJ failed to consider significant and relevant medical opinions of record when forming his proposed RFC; (2) the ALJ created his own medical assessment of capability which was not supported by any evidence of record; (3) the ALJ improperly assessed the credibility of the claimant by making assumptions regarding the claimant's physical activities that are not supported by evidence; and (4) the ALJ offered an erroneous RFC assessment to the VE by creating a medical opinion and avoiding medical evidence of record. (Docs. ## 10, 15).

The Commissioner argues that the ALJ's decision is supported by substantial evidence and must, therefore, be affirmed. (Doc. #13).

A review of the ALJ's decision indicates he based his assessment of Plaintiff's RFC on the opinions of state agency physicians, Drs. McCloud and Bolz. The ALJ found their opinions "are entitled to significant adjudicative weight." (*PageID#* 107). These physicians, however, did not personally examine Plaintiff, interview Plaintiff, or listen to his subjective complaints. Moreover, neither doctor had the opportunity to review any of

15

the medical evidence which was submitted to the file after the dates of their respective reviews, including all of the medical evidence that is contained in Exhibits 10F through 19F with respect to Dr. McCould (*PageID*## 543-726), and Exhibits 14F through 19F with respect to Dr. Bolz. (*PageID*## 607-726). Although much of the evidence these doctors did not get the opportunity to review related to treatment Plaintiff received after his insured status expired, such medical evidence should nevertheless have been reviewed by them since it was relevant and material to the impairments that limited Plaintiff prior to the expiration of his insured status. *See Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988) (stating parenthetically, "evidence of medical condition after insurance cutoff must be considered to the extent it illuminates claimant's health before that date," citing *Martonik v. Heckler*, 773 F.2d 236, 240-41 (8th Cir. 1985)); *see, e.g., Johnson v. Sec'y of Health, Educ. & Welfare*, 679 F.2d 605 (6th Cir. 1982); *Taylor v. Sec'y of Health &Human Servs.*, 892 F.2d 80, 1989 WL 153548 at **4 (6th Cir. 1989).

At least one other Circuit has specifically held, "medical evidence from a time subsequent to a certain period is relevant to a determination of a claimant's condition during that period." *Halvorsen v. Heckler*, 743 F.2d 1221, 1225 (7th Cir. 1984); *cf. Johnson v. Secretary of Health, Educ. and Welfare*, 679 F.2d 605, 606-07 (6th Cir. 1982)(fact that plaintiff was voluntarily committed to hospital with severe mental illness should have been considered when determining whether he had been disabled for a prior twelve-month period); *Paquette v. Sullivan*, 1990 WL 66814 at **2 (6th Cir.

16

1990)("Post-insured status evidence may be considered only if it sheds light on the a claimant's condition during the insured period.").

The additional evidence in this case clearly documents a progressive deterioration of Plaintiff's peroneal nerve injury to the left leg with foot drop and chronic back pain secondary to degenerative disc disease with radiculopathy. Yet Drs. McCloud and Bolz's opinions regarding the severity of Plaintiff's impairments, and the limitations that he has as a result of those impairments, were not based on a review of the entire record in this case. This point must not be overlooked, however, as one of the relevant factors considered in deciding the weight to give a medical opinion is "the extent to which an acceptable medical source is familiar with the other information in your case record . . . ." 20 CFR 404.1527(c)(6).

As to the opinion of Ms. Coffey, the ALJ rejected it because Ms. Coffey's qualifications were not set forth in the assessment and she saw Plaintiff subsequent to the date last insured. The ALJ further notes that the objective test results show no change in the nature or severity of Plaintiff's condition since his disability onset date. In addition, the ALJ notes that Ms. Coffey provides no explanation for her assessment beyond referring to chronic pain. (*PageID#* 107). The ALJ assigned Ms. Coffey no adjudicative weight. (*Id.*). SSR 06-03p essentially provides that while the factors set forth in 20 C.F.R. § 404.1527(d) apply only to evaluating medical opinions from acceptable medical sources, the same factors can be applied to opinion evidence from other sources. Further, Ruling 06–03p "notes that information from 'other sources' cannot establish the existence

17

of a medically determinable impairment, [but] the information 'may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function.'" *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 541 (6th Cir. 2007) (quoting SSR 06–03p, 2006 SSR LEXIS 4, 2006 WL 2329939 (S.S.A.)).  Factors that apply to an ALJ's consideration of opinions by non-acceptable medical sources, when they have seen the claimant in their professional capacity, include "how long the source has known the individual, how consistent the opinion is with other evidence, and how well the source explains the opinion."  *Id.* (citing *Martin v. Barnhart*, 470 F.Supp.2d 1324, 1328–29 (D.Utah 2006)).

The Commissioner contends that Ms. Coffey's 2011 opinion was subsequent to the date Plaintiff was last insured for disability on December 31, 2010, and that Plaintiff fails to articulate how this opinion would even be relevant to proving he was disabled prior to this date.  (*See* Doc. #13, *PageID#* 769).  Although post-insured status evidence of a claimant's condition is generally not relevant, *see Bagby v. Harris,* 650 F.2d 836 (6th Cir. 1981) and *Bogle v. Sec'y of Health & Human Servs.,* 998 F.2d 342 (6th Cir. 1993), such evidence will be considered if it establishes that an impairment existed continuously and in the same degree from the date the insured status expired.  *Johnson v. Sec'y of Health & Human Servs.,* 679 F.2d 605 (6th Cir. 1982).  Ms. Coffey's opinion tends to establish precisely that as to Plaintiff's condition.  (*PageID##* 714-20).  Dr. Oza, too, concluded in 2009 that Plaintiff has chronic back pain and left sided L5-Sl radiculopathy and that work related activities even at the sedentary level would be affected.  (*PageID#* 503).

18

Accordingly, Ms. Coffey's opinion was consistent with other medical evidence of record prior to the date last insured and should have been considered.  Moreover, it should be noted that it is quite paradoxical that the ALJ deems Ms. Coffey's opinion as irrelevant based on the fact she saw Plaintiff after the date last insured when the ALJ, himself, relies on activities of the Plaintiff that occurred after the date last insured in finding Plaintiff not to be disabled.  (*Compare* Doc. #8, *PageID##* 99, 104, 106 (citing to Plaintiff's activities and treatment notes in 2011), *with* Doc. #8, *PageID#* 107 (rejecting Ms. Coffey's opinion on basis that she treated Plaintiff in 2011, after date last insured of December 31, 2010)).

The ALJ also failed to properly evaluate or weigh Dr. Oza's opinion under any criteria mandated by the Regulations.  When referring to Dr. Oza – who performed the consultative physical examination on December 7, 2009 – the ALJ merely referred to her opinion as follows: Dr. Oza found "similar findings .... related to peroneal nerve injury and chronic back pain with a left-sided L5-S1 radiculopathy.  Dr Oza concluded that work activity at the sedentary level would be affected." (*PageID#* 99).  An ALJ may not ignore evidence favorable to the plaintiff.  Rather, he "must consider all the record evidence and cannot 'pick and choose' only the evidence that supports his position." *Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000) (citing *Switzer v. Heckler*, 742 F.2d 382, 385-86 (7th Cir. 1984)).

Also troubling is the fact that Dr. McCloud limited Plaintiff to light work yet the ALJ found Plaintiff could perform sedentary exertional work.  "ALJs must not succumb

19

to the temptation to play doctor and make their own independent medical findings."
*Simpson v. Comm'r of Soc. Sec.*, 344 F. App'x 181, 194 (6th Cir. 2009) (quoting *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996)).  By summarily disregarding the opinions of Drs. McCloud, Bolz, Oza and Ms. Coffey – and thereby basing his findings upon no medical opinion of record – the ALJ improperly substituted his lay opinion for that of a medical expert who would be qualified to make such a medical determination.[4] Moreover, the ALJ failed to set forth a sufficient basis for disregarding the opinions of Dr. Oza and Ms. Coffey.

The ALJ thus erred by favoring his own lay interpretation of the medical evidence, and formulating a RFC based on that interpretation, as well as a selective incorporation of the portions of the medical opinions which supported a non-disability finding.  *See Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 240-41 (6th Cir. 2002)(finding the ALJ's decision was not supported by substantial evidence, as the RFC included only the portions of a medical source's report which suggested the claimant was capable of working, and did not accurately describe the claimant's abilities).  Accordingly, Plaintiff's challenges to the ALJ's determination are well taken.[5]

## VI.  Remand is Warranted

If the ALJ failed to apply the correct legal standards or his factual conclusions are

---

[4] While there may be limited occasions when the medical evidence is so clear, and so undisputed, that an ALJ may be justified in drawing functional capacity conclusions from such evidence without the assistance of a medical source, this is not such a case.

[5] In light of the above review, and the resulting need for remand of this case, an in-depth analysis of the parties' other contentions is unwarranted.

not supported by substantial evidence, the Court must decide whether to remand the case for rehearing or to reverse and order an award of benefits.  Under Sentence Four of 42 U.S.C. § 405(g), the Court has authority to affirm, modify or reverse the Commissioner's decision "with or without remanding the cause for rehearing." *Melkonyan v. Sullivan*, 501 U.S. 89, 99 (1991). Remand is appropriate if the Commissioner applied an erroneous principle of law, failed to consider certain evidence, failed to consider the combined effect of impairments, or failed to make a credibility finding.  *Faucher v. Sec'y of Health & Human Servs.*, 17 F.3d 171, 176 (6th Cir. 1994).

A judicial award of benefits is unwarranted in the present case because the evidence of disability is not overwhelming, and because the evidence of a disability is not strong while contrary evidence is weak.  *See Faucher*, 17 F.3d at 176.

Plaintiff, however, is entitled to an Order remanding this case to the Social Security Administration pursuant to Sentence Four of § 405(g), due to the problems identified above. On remand, the ALJ should be directed to: (1) re-evaluate the medical source opinions of record under the legal criteria set forth in the Commissioner's Regulations, Rulings, and as required by case law; and (2) determine anew whether Plaintiff was under a disability and thus eligible for DIB during the period in question.

Accordingly, the case should be remanded to the Commissioner and the ALJ for further proceedings consistent with this Report and Recommendations.

### IT IS THEREFORE RECOMMENDED THAT:

1. The Commissioner's non-disability finding be vacated;

2.      No finding be made as to whether Plaintiff John B. Adams
        was under a "disability" within the meaning of the Social
        Security Act;

3.      This case be remanded to the Commissioner and the
        Administrative Law Judge under Sentence Four of 42 U.S.C.
        § 405(g) for further consideration consistent with this Report;
        and

4.      The case be terminated on the docket of this Court.


November 6, 2014


                                   s/Sharon L. Ovington
                                  Sharon L. Ovington
                       Chief United States Magistrate Judge

22

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within **FOURTEEN** days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(d), this period is extended to **SEVENTEEN** days because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F). Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within **FOURTEEN** days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947, 949-50 (6th Cir. 1981).